**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAMELA LUNDELL, | ) Case No.: 1:09-cv-01673 JLT |
| Plaintiff, | ) ORDER DENYING PLAINTIFF'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| v. | ) (Doc. 20) |
| MICHAEL J. ASTRUE, | ) ORDER GRANTING DEFENDANT'S CROSS- |
| Commissioner of Social Security, | ) MOTION FOR SUMMARY JUDGMENT |
| Defendant. | ) (Doc. 22) |
| | ) ORDER DIRECTING THE ENTRY OF |
| | ) JUDGMENT IN FAVOR OF DEFENDANT |
| _____ | ) MICHAEL J. ASTRUE AND AGAINST |
| | ) PLAINTIFF PAMELA LUNDELL |

Pamela Lundell ("Plaintiff") asserts she is entitled to disability insurance benefits under Title II of the Social Security Act.  Plaintiff argues the administrative law judge ("ALJ") failed to find her depression and lupus were severe impairments at step two of the sequential evaluation, and erred evaluating the medical and opinion testimony.  Therefore, Plaintiff seeks judicial review of the administrative decision denying her claim for benefits.

For the reasons set forth below, Plaintiff's motion for summary judgment (Doc. 20) is **DENIED**, and Defendant's cross-motion for summary judgment (Doc. 22) is **GRANTED**.

///

///

1

**PROCEDURAL HISTORY**[1]

Plaintiff filed an application for disability insurance benefits on February 18, 2005, alleging disability beginning February 14, 2003.  AR at 69.  The Social Security Administration denied her claim initially on July 22, 2005, and upon reconsideration on December 14, 2005.  *Id.* at 54-58, 62-66.  After requesting a hearing, Plaintiff testified before an ALJ on January 8, 2007.  *Id.* at 497.

The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on March 28, 2007.  AR at 16-24.  Plaintiff requested a review by the Appeals Council of Social Security, which considered additional evidence and denied review of the ALJ's decision on June 5, 2009.  *Id.* at 8-11.  Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).  The record as a whole must be considered, as "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under Title II of the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

impairment that has lasted or can be expected to last for a continuous period of not less than 12

months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work, but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him, or whether he would be hired
> if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.
Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  When a claimant establishes a prima facie case of
disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other
substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process
for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520(a)-(f).  The process requires
the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of
alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of
the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4)
had the residual functional capacity to perform to past relevant work or (5) the ability to perform
other work existing in significant numbers at the state and national level.  *Id.*  In making these
determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony.
20 C.F.R. §§ 404.1527, 404.1529.

A.   Relevant Medical Evidence

Plaintiff received treatment from Memorial Hospitals Association, where her primary treating
physical was Dr. P.B. Iyer.  AR at 224-302.  On January 20, 2003, Dr. Iyer noted Plaintiff had a
"history of severe bilateral knee pain, right little finger pain, anemia and estrogen deficiency
syndrome." *Id.* at 293.  Plaintiff 's knee pain had developed recently, and an examination revealed
"tenderness along [the] medial meniscus."  *Id.* Also, examination of Plaintiff's back showed
"minimal tenderness."  *Id.*  However, x-rays of Plaintiff's knees were "noted to be unremarkable,"
and an "x-ray of the LS-Spine [was] noted to be normal." *Id.* at 292.

On February 24, 2003, Plaintiff complained of "significant knee pain" and a "quite substantial and severe" backache. AR at 291. In addition, Plaintiff reported pain in her right hand at had "been getting worse." *Id.* As a result, Dr. Iyer ordered an MRI of Plaintiff's LS-Spine, and knee conducted by Dr. Robert Anderson, who found the MRI of Plaintiff's back was a "normal study, without evidence for disc herniation," and the MRI of her knee was "negative." *Id.* at 290-91. Also, Dr. Iyer referred Plaintiff to Dr. Gurpreet Dhaliwal, who completed an electromyography report on March 12, 2003. *Id.* at 132-33, 291.

Dr. Dhaliwal noted Plaintiff "complain[ed] of right arm pain and weakness in her arm." *Id.* at 132. Dr. Dhaliwal observed: Plaintiff had "5/5 strength bilaterally. Sensory exam appeared intact. Reflexes were 1+ and equal. Gait was normal. Cerebellar exam was normal." *Id.* Following EMG and nerve conduction studies, as well as a needle electrode exam, Dr. Dhaliwal concluded Plaintiff's results were "normal . . . without any carpal or cubital tunnel syndrome on the right side." *Id.* In addition, Dr. Dhaliwal found "no electrodiagnostic evidence of myopathy or cervical radiculopathy in the right upper extremity." *Id.* Despite the negative results of the nerve conduction studies, Dr. Iyer gave Plaintiff a splint for her right wrist on March 24, 2003. *Id.* at 289.

Plaintiff reported "significant chest pain," persistent "numbness involving her hands," and "some shortness of breath" on April 14, 2003. AR at 288. An x-ray of Plaintiff's chest "was noted to be normal." *Id.* Due to Plaintiff's continuing symptoms, Dr. Iyer referred Plaintiff to Dr. Warren King for treatment of cubital tunnel syndrome. *Id.* at 134-36, 288. Dr. King treated Plaintiff on April 23, 2003, and she reported that her fingers felt "stuck." *Id.* at 135. Plaintiff said she had pain in her armpit, right chest region, left knee, and lower back. *Id.* On examination, Plaintiff showed "loss of sensation to touch, pin prick and cold sensitivity involving the fourth and fifth digits ulnar nerve distribution right hand." *Id.* Plaintiff had a full range of motion and no tenderness in her left knee and lower back. *Id.* Dr. King agreed with Dr. Iyer that Plaintiff had "classic signs and symptoms consistent with cubital tunnel syndrome," though the nerve study and EMG performed by Dr. Dhaliwal were negative. *Id.* at 134.

Plaintiff received physical therapy at Sport & Rehab Physical Therapy in June and July 2003. AR at 137. After her second visit, Plaintiff reported an increase in symptoms but "reported no

4

change in pain level." *Id.* at 137.  Plaintiff requested an early discharge from physical therapy "due to financial difficulties with her co-pay and other health issues," and the treatment ended on July 17, 2003. *Id.*

On July 21, 2003, Dr. Iyer determined that an x-ray of Plaintiff's C-spine "does not reveal significant abnormalities," and he ordered an MRI scan of Plaintiff's brachial plexus.  AR at 285.  In examining the results of the MRI, Dr. Michael Tekautz concluded, "No definite brachia plexus abnormalities are seen." *Id.* at 284.  However, Dr. Tekautz found there were "multilevel cervical disc degenerative changes, most prominent at C5-C6 with probable right foraminal narrowing." *Id.*

Plaintiff continued to complain of severe right arm pain and neck pain on August 6, 2003. AR at 283.  Therefore, Dr. Iyer referred Plaintiff to Dr. Bal Rajagopalan, who examined Plaintiff on September 10, 2003. *Id; see also id.* at 147.  Dr. Rajagopalan noted that Plaintiff complained of "pain in her neck and also in her right arm with symptoms of carpal tunnel in the first three digits," which she had "for 10 years." *Id.*  Dr. Rajagopalan determined Plaintiff should have dynamic EMG's and nerve conduction studies, *id.*, which were performed on Plaintiff's upper extremities by Dr. Gary Platt on October 2, 2003. *Id.* at 139.   Plaintiff told Dr. Platt that she had been off work since February, and "her symptoms have not bothered her as much, although they continue to bother her." *Id.*  The tests showed Plaintiff's evoked responses and motor nerve conduction velocities were within normal limits, although distal latency was "toward the upper limits of normal." *Id.* at 141. Dr. Platt concluded Plaintiff showed "evidence for a mild right carpal tunnel syndrome, but there was "no evidence for any other peripheral entrapment neuropathy." *Id.*  On October 29, 2003, Dr. Rajagopalan diagnosed Plaintiff with right carpal tunnel syndrome and stated she would "be off [work] for two months and should proceed to "get state disability." *Id.* at 146.

From December 2003 through January 2004, Plaintiff reported panic attacks, depression, and anxiety, for which she was given Lexapro and Wellbutrin.  AR at 281.  On December 31, 2003, Plaintiff reported "significant agitation, insomnia, and fatigue." *Id.* at 280.  Dr. Iyer discontinued her prescriptions, and started her on Abilify.  *Id.*  Plaintiff's husband accompanied her to the appointment on January 23, 2004, and "mentioned that she had been taking large quantities of methamphetamines [sic] recently and had a lapse in judgment and lost a lot of money through

1   internet gambling." *Id.* at 279.  Further, Dr. Iyer noted:  "They are in a big mess financially and

2   emotionally.  Abilify has helped her.  She is dealing with things better." *Id.*

3        Following carpal tunnel surgery, Dr. Rajagopalan opined Plaintiff was "doing absolutely

4   great" on January 27, 2004.  AR at 145.  He concluded her right carpal tunnel was gone, but she had

5   "lateral epicondylitis as well," which would be treated with an injection the following month because

6   Plaintiff wanted to hold off the treatment.  *Id.*  Dr. Rajagopalan confirmed his findings on March 2,

7   2004, finding Plaintiff's "carpal tunnel surgery went great" and he was "very pleased with . . . how

8   she has responded." *Id.* at 144.  To treat the lateral epicondylitis, he injected Plaintiff with Depo

9   Medrol and Maraine.  *Id.*

10        On March 29, 2004, Dr. Iyer noted Plaintiff had "been gaining substantial amounts of weight

11   in the recent past."  AR at 274.  Also, Plaintiff reported back pain right chest pain, and fatigue.  *Id.*

12   Likewise, on May 5, Dr. Iyer noted Plaintiff had significant weight gain and muscle pain that "ha[d]

13   been going on for some time." *Id.* at 272.  He added Wellbutrin to her prescriptions to "help with

14   weight gain and depression, as well as to prevent relapse to crank abuse." *Id.*  In June, Plaintiff

15   reported an increase of symptoms in addition to her weight gain, including: chest pain, dyspepsia and

16   palpitations, heartburn, an inability to sleep, and extreme weakness.  *Id.* at 267.  However, EKG test

17   results were normal.  *Id.*  Dr. Iyer stopped Plaintiff's treatment on Abilify and prescribed Zoloft, with

18   which Plaintiff was "[d]oing much better" on June 22, 2004.  *Id.* at 266-67.

19        Plaintiff reported "significant shortness of breath and fatigue" on November 2, 2004, and

20   "ha[d] been wheezing quite a bit in the recent past."  AR at 262.  In addition, Dr. Iyer noted Plaintiff

21   reported "a significant skin rash over her chest and back that has been getting worse" over the course

22   of four weeks.  *Id.*  Dy. Iyer suspected a methicillin-resistent Staphylococcus areaus infection and left

23   ventricular failure based upon a chest x-ray, and ordered an echocardiograph.  *Id.*  On November 3,

24   Dr. Dasaratha Vemireddy found "Normal left ventricular diameter with no regional wall motion

25   abnormalities," and "[n]o evidence of hemodynamically significant valvular regurgitation." *Id.* at

26   258.  A treadmill test on November 11 yielded normal results, and Dr. Iyer diagnosed Plaintiff with

27   exertional dyspnea, fatigue, and accelerated hypertension.  *Id.* at 254. He noted Plaintiff "continue[d]

28   to have significant problems with shortness of breath and skin problems." *Id.*

On November 30, 2004, Dr. David Pilkington evaluated skin lesions on Plaintiff's face and chest, which she reported were asymptomatic but increasing in size and number. AR at 153. Plaintiff was treated with oral antibiotics without any significant improvement. *Id.* Dr. Pilkington noted the examination revealed several indurated erythematous plaques on Plaintiff's left cheek, and some on her upper chest. *Id.* According to Dr. Pilkington, Plaintiff's condition was "consistent with an infiltrative process . . . [and] in cases of lupus erythematous and lymphoma cutis." *Id.* He scheduled a biopsy, after which Dr. Pilkington diagnosed Plaintiff with lupus. *Id.*; AR at 154-55.

Dr. Robert Morgan provided a comprehensive psychological evaluation of Plaintiff in anticipation of a bariatric surgery on January 29, 2005. AR at 157. Plaintiff reported she had "opted to discontinue her employment to stay home to assist in the care of her husband," who suffered cardiac problems. *Id.* at 158. In addition, Plaintiff reported she was diagnosed with lupus and stated she was "increasingly depressed 'owing in large measure to [her] weight gain,'" but believed she was getting better at handling her depression. *Id.* at 158-59. Dr. Morgan observed:

> She is alert, ambulatory and fully oriented to person, place, time and situation. She is cooperative and calm throughout the course of the examination. She is presenting in a mildly depressed mood with a mild restriction of affect. She does present with some symptoms relative to depression, but denies clearly suicidal or homicidal thought, plan or intent. Her speech is of usual rate and rhythm … Mrs. Lundell denies auditory or visual hallucinations, denies illusions, denies feelings of unreality or déjà vu. Thought content is negative for delusions, negative for ideas of reference with no thought blocking, no obsessions, no phobias and no compulsions. Thought processes are logical and goal-oriented with no tangentiality, no circumstantiality and no irrelevancies. IQ is estimated to be average. Attention and concentration is within normal limits, memory is intact for immediate, recent and remote events, fund of knowledge is adequate, as is social judgment and insight into present level of functioning is good.

*Id.* at 161. Dr. Morgan diagnosed Plaintiff with a "mild-to-moderate depression," and gave Plaintiff a GAF score of 55-60.[2] *Id.* at 161, 163. In addition, Dr. Morgan stated Plaintiff "denoted lupus, migraines, possible sleep apnea, shortness of breath with possible asthma, arthritis in her neck and back, chronic fatigue and constant pain in lower back and knees." *Id.* at 158.

---

[2] GAF (global assessment functioning) scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.*

On February 1, 2005, Plaintiff had a cardiology consultation from Dr. Donald St. Claire for "progressive exertional dyspnea and intermittent chest pain."  AR at 164.  Plaintiff disclosed a history of methamphetamine abuse, which she stated she ended about a year before, and reported that she had gained about fifty pounds since ending her drug abuse.  *Id.*  Plaintiff's exercise stress test and pulmonary function tests yielded normal results.  *Id.*  Dr. St. Claire noted Plaintiff had "a somewhat vesicular maculopapular rash over her entire back and upper chest," which Plaintiff said was "intermittently itchy."  *Id.* at 165.  Dr. St. Claire preformed an echocardiogram, which "demonstrate[d] normal left ventricular systolic and diastolic function with an estimated ejection fraction of 65%."  *Id.* at 166.  Also, Dr. St. Claire found Plaintiff had no valvular abnormalities and no evidence of myocardial ischemia.  *Id.*  Dr. St. Claire suspected Plaintiff's shortness of breath and easy fatigability were "predominately related to her dramatic weight gain over the past year," and found no need for further cardiac evaluation.  *Id.*  Following this examination, Dr. Iyer noted "No evidence of heart disease was found."  *Id.* at 243.

Dr. Nguyen reviewed the medical evidence and completed an assessment of Plaintiff's physical residual functional capacity on May 10, 2005.  AR at 175-84.  Dr. Nguyen opined Plaintiff had the ability to: frequently lift and carry 10 pounds and occasionally 20 pounds; stand or walk for at least two hours in an eight-hour day; sit for about six hours in an eight-hour day.  *Id.* at 176.  Also, Dr. Nguyen opined Plaintiff had the following postural limitations due to her "obesity/ weight gain:" she could frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps stairs, ladders, and ropes, but never climb scaffolds.  *Id.* at 177.  Further, Dr. Nguyen concluded Plaintiff had no manipulative, visual, communicative, or environmental limitations, and had unlimited push and pull capabilities.  *Id.* at 176, 178-79.  Dr. Nguyen based these findings on lab results and EKG studies chronicling Plaintiff's symptoms from October 2004 through March 2005.  *See id.* at 182.

On June 15, 2005, Plaintiff had a laparoscopic gastric bypass surgery performed by Dr. Patrick Coates at Memorial Medical Center.  AR at 193-94.  Following the procedure, Plaintiff was "doing very well" and was "very eager to go home."  *Id.* at 188.  Therefore, the hospital discharged Plaintiff on June 17, 2005.  *Id.*

1    Dr. Steven Swanson performed a consultative examination and completed a psychological

2    assessment on July 2, 2005.  AR at 205-09.  Plaintiff disclosed a history of methamphetamine abuse,

3    and stated she had stopped using drugs approximately three or four months before the consultation.

4    *Id.* at 206.  Dr. Swanson found no vegetative signs of depression, and Plaintiff's "[s]hort-term,

5    recent, and remote memories were within normal limits." *Id.* at 207.  In addition, based upon

6    Plaintiff's responses to questions, Dr. Swanson concluded Plaintiff's judgment and insight were

7    intact, and her general fund of knowledge fell within normal limits.  *Id.*  Plaintiff "maintained

8    satisfactory attention and concentration throughout" the consultation.  *Id.*  Dr. Swanson offered the

9    following assessment:

> [Plaintiff] is judged as able to maintain concentration or relate appropriately to others in
> a job setting. She would be able to handle funds in her own best interests.  She is
> expected to understand, carry out, and remember simple instructions.  She is judged as
> able to respond appropriately to usual work situations, such as attendance, safety, and the
> like.  Changes in routine would not be very problematic for her.  There do not appear to
> be substantial restrictions in daily activities.   Difficulties in maintaining social
> functioning do not appear to be present.

14   *Id.* at 208.  Dr. Swanson gave Plaintiff a GAF score of 70.[3]  *Id.*  Also, Dr. Swanson noted "[Plaintiff]

15   reported that she is independently able to complete all activities of daily living." *Id.*  For example,

16   Plaintiff was able to drive, "bathe and dress herself, do household chores, prepare simple meals,

17   shop, do laundry, and make use of public transportation." *Id.* at 206.

18   Dr. Joseph Schnitzler completed a psychiatric review technique on July 20, 2005, and opined

19   Plaintiff's impairments were not severe.  AR at 210.  Dr. Schnitzler opined Plaintiff had mild

20   restrictions in activities of daily living and mild difficulties in maintaining social functioning and

21   concentration, persistence, or pace.  *Id.* at 220.

22   In August 2005, Plaintiff presented with pain in her chest, arm, and back.  AR at 231.  Dr.

23   Iyer noted, "After discussion, it is very likely her symptoms are due to gastritis."  *Id.*  Therefore, Dr.

24   Iyer prescribed Prilosec and Lortab.  At a follow-up appointment, Dr. Iyer diagnosed Plaintiff with

25   gastritis and chest pain.  *Id.* at 230.

26

27   _____

28   [3] A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some
difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful
interpersonal relationships." *DSM-IV* at 34.

1    Plaintiff had an MRI performed on her lumbar spine by Dr. Tekautz on October 7, 2005.  AR at 226.

2    Dr. Tekautz found the results were "essentially unchanged" from a previous examination.  *Id.*

3    Specifically, Dr. Tekautz noted:

> The lumbar vertebrae demonstrate normal height and alignment.  Marrow signal is
> normal.  At T12-L1, there is mild disc narrowing and degeneration.  There is a small
> focal central disc protrusion which is unchanged from the previous examination.  Upper
> lumbar levels are normal.
>
> At L4-5, there is mild disc degeneration.  There is a very mild broad-based central disc
> protrusion which is causing mild neutral compression of the thecal sac.  There is no
> foraminal involvement.  The L5-S1 level is normal.  The facet joints are intact.  There
> is no spinal stenosis.

9    *Id.* According to Dr. Tekautz, the remainder of the study was "within normal limits."  *Id.*

10           Dr. Iyer completed a medical report of Plaintiff's physical and mental work-related

11   impairments on January 23, 2007.  AR at 316-19.   Dr. Iyer noted Plaintiff was complaint with

12   treatment, but her response to treatment and prognosis was poor.  *Id.* at 316.  According to Dr. Iyer,

13   Plaintiff's impairments met a Listing because Plaintiff was "quite depressed" and had "chronic pain,

14   back problems [and] hand weakness."  *Id.* Dr. Iyer opined Plaintiff could occasionally lift and carry

15   up to ten pounds, but never more than ten pounds.  *Id.* at 317.   He concluded Plaintiff's back

16   tenderness, spasms, and decreased strength limited her to sitting up to four hours, standing up to two

17   hours, and walking for one hour during a normal eight hour workday.  *Id.*  Plaintiff was unable to sit,

18   stand, or walk for at least an hour without interruption.  *Id.*  Further restrictions included exposure to

19   heights and moving machinery, because Dr. Iyer believed Plaintiff had "poor balance, could fall

20   easily."  *Id.* at 318.

21           In assessing Plaintiff's mental impairments, Dr. Iyer indicated Plaintiff had a "fair" ability to

22   follow work rules, relate to co-workers, deal with the public, use judgment, and interact with

23   supervisor.  AR at 318.  Plaintiff had a "poor" ability to deal with work stress, function

24   independently, or maintain attention/ concentration.  *Id.*  Likewise, Dr. Iyer opined Plaintiff's ability

25   to understand, remember, or carry out any instructions (ranging from simple to complex) was "poor"

26   due to her use of narcotics.  *Id.*  Dr. Iyer noted Plaintiff had a "fair" ability to maintain personal

27   appearance, behave in an emotionally stable manner, and relate predictably in social situations, but a

28   "poor" reliability because Plaintiff was "on medications that affect function."  *Id.*

B.  Hearing Testimony

Plaintiff testified that she was first diagnosed with lupus in January of 2005, and was treated primarily by Dr. P. B. Iyer.  AR at 499.  Plaintiff, said she experienced "a lot of joint pain."  *Id.* at 500.  Plaintiff said her "entry body hurts," but the majority of the pain was in her lower back and down her left leg.  *Id.*  Other symptoms of her lupus Plaintiff included welts on her skin, headaches, and fatigue.  *Id.* at 500-01.  Plaintiff said a side effect of her medications was sleepiness and feeling groggy.  *Id.* at 503-04.  However, Plaintiff stated she did not sleep well, and estimated that she slept one to two hours at a time, "off and on all night."  *Id.* at 501.  Plaintiff said she would take naps during the day.  *Id.*  According to Plaintiff, she was at the second stage of lupus, which "ha[d] a lot to do with the chronic joint pain, the fatigue, [and] the skin irritations."  *Id.* at 501-02.

Plaintiff said she suffers also from depression.  AR at 504.  Plaintiff reported feeling anxious, fearful, and had suicidal thoughts previously in 2005.  *Id.*  Plaintiff said, "I feel like I'm in a glass, and I can't get out . . . there's nowhere to turn.  There's no corner to go to."  *Id.*  In addition, Plaintiff stated she had difficulty concentrating, and she had difficulty remembering what she was doing.  *Id.* at 505.  Plaintiff reported difficulty understanding and remembering instructions.  *Id.* at 506.  Plaintiff attributed her depression to frustration with being unable to understand or do tasks.  *Id.*  Plaintiff reported walking was sometimes difficult and said, "I don't walk very far before it starts to hurt."  AR at 500.  Plaintiff did not believe she could not sit for long, and estimated she could sit "15 or 20 minutes, if that, maybe ten."  *Id.* at 503.  Likewise, Plaintiff estimated she could stand for "15, 20 minutes" before she would have to lie down or sit down.  *Id.*  Plaintiff said she would need four or five rest breaks in an eight-hour workday.  *Id.*  Plaintiff believed she could no longer do her past work as an office manager because she could not sit at a computer very long and was unable to keep organized, and could not return to line assembly work because she injured her hand in a machine.  *Id.* at 506-07.

Vocational expert ("VE") George Meyers testified after Plaintiff. The VE characterized Plaintiff's past work as follows: "an office manager, DOT number 169.167-034, sedentary, skilled, SVP seven, and . . . a general office clerk 209.562-010, light, semiskilled, SVP three, and assembler of small products, DOT number 706.684-022, light, unskilled, SVP two."  AR at 508-09.

11

1    The ALJ asked the VE to consider " a person the same age, education, and work experience"

2    as Plaintiff, who "could occasionally lift 20 pounds, frequently ten; stand at least two hours in an

3    eight-hour day; or sit six hours in an eight-hour day." AR at 509.  In addition, the person could "only

4    occasionally climb rams or stairs; occasionally stoop, kneel, crouch, and craw; but can never climb . .

5    . ropes or scaffolds." *Id.*  The VE opined such an individual would be able to perform Plaintiff's past

6    relevant work as an office manager. *Id.*  Plaintiff's counsel then questioned the VE, inquiring

7    whether an individual who "could only sit for 15 to 20 minutes at a time and would have to stand or

8    lie down" would be able to perform work as an office manager.  AR at 509.  The VE said such a

9    person would not be able to work in that position. *Id.*

10   C.  Third-Party Statement

11       Pamela Real, Plaintiff's sister-in-law, completed a third party "function report" on March 17,

12   2005. AR at 93-101.  Ms. Real reported she would "go to the doctor with [Plaintiff] or . . . take her

13   to town for necessities." *Id.* at 93.  Ms. Real stated she did not know Plaintiff's daily routine, but

14   Plaintiff and her husband had "a relationship where the wife/ husband take care of each other." *Id.* at

15   93-94.

16       Ms. Real commented, "Due to her illness, [Plaintiff] is unable to work outside the house as

17   she has difficulty sitting, standing, [and] walking, most of the time." *Id.* at 94.  In addition, Ms. Real

18   observed, "Her joints seem to cause her severe pain.  She can no longer feed hay to the animals or

19   care for her yard in the previous capacity.  Her involvement with her niece and nephews has lessened

20   as she is unable to join them now at most of their activities." *Id.*  Ms. Real stated Plaintiff could

21   prepare her own meals, perform light cleaning, do laundry, shop for groceries, and go outside

22   regularly to take the dog out and get the mail. *Id.* at 95-96. According to Ms. Real, Plaintiff would

23   visit with her niece and nephews at least once a week. *Id.* at 96.

24       Ms. Real believed Plaintiff's condition affected her ability to lift, squat, bend, stand, reach,

25   walk, sit, kneel, and use her hands.  AR at 98.  In addition, Ms. Real believed the condition affected

26   Plaintiff's memory and concentration, but believed Plaintiff's medication helped: "[Plaintiff] is

27   better now that they have her on medication.  Before, she would forget to pick up my kids from

28   school on occasion." *Id.* at 97-98.  Ms. Real observed, "[Plaintiff] use[d] 'to go 100 miles an hour'

12

1  making me tired.  Now, since her illness everything appears to be a struggle and very slow paced."

2  *Id.* at 98.  Also, Ms. Real opined Plaintiff did not handle changes or stress well, because "she has not

3  had the strength needed to handle daily stresses."  *Id.* at 99.

4  <u>D.   The ALJ's Findings</u>

5       Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

6  gainful activity from the alleged onset date of February 14, 2003.  AR at 23.  Second, the ALJ found

7  Plaintiff has the following severe impairments: "mild degenerative disc disease lumbar and thoracic

8  spine at 2 levels, obesity status- post June 15, 2005 gastric-bypass procedure, and history of long-

9  time amphetamine addiction, status-post remission circa January 2004."  *Id.*  These impairments did

10  not meet or medically equal a listing.  *Id.*

11       The ALJ determined Plaintiff had the residual functional capacity ("RFC") "to perform a

12  wide range of 'light' work, lifting and carrying up to 20 lbs. occasionally and 10 lbs. frequently,

13  sitting for 6 hours and standing and walking up to 2 hours each in an 8-hour workday with normal

14  breaks."  AR at 24.  In addition, the ALJ added the following limitations:  "The claimant should not

15  climb ladders, ropes, or scaffolding, and should not frequently climb ramps and stairs, stoop, kneel,

16  crouch, or crawl—although she may perform these postural tasks occasionally."  *Id.*  With this RFC,

17  Plaintiff was capable of performing past relevant work as an office manager, general office work,

18  and assembler.  *Id.*  Further, the ALJ noted, "Alternatively, even if found limited to simple repetitive

19  tasks only, based on her residual functional capacity, education, and vocational experience, a finding

20  of 'not disabled' would also be reached at the [fifth] sequential evaluation step."  *Id.*  Therefore, the

21  ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  *Id.*

22                    **NEW EVIDENCE BEFORE THE APPEALS COUNCIL**

23       Plaintiff submitted additional medical evidence to the Appeals Council, which included:

24  treatment notes of Dr. Iyer, an additional page from Dr. Iyer's report on Plaintiff's physical abilities,

25  and letters regarding Plaintiff's treatment at Stanford and the Central Valley Pain Management and

26  Wellness Clinic.  *See* AR at 320-496.  The Appeals Council made the additional medical evidence a

27  part of the record, and "found that this information does not provide a basis for changing the

28  Administrative Law Judge's decision."  AR at 8-9.  When the Appeals Council considers evidence

provided by a claimant after the ALJ's decision, the Court reviews both the ALJ's decision and additional material submitted to the Appeals Council. *Ramirez v. Shalala*, 8 F.3d 1449, 1451-52 (9th Cir. 1993).

Notably, the Regulations provide: "In reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals council shall consider the additional evidence *only* where it relates to the period *on or before* the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b) (emphasis added). Evidence is material if it is "relevant to the claimant's condition for the time period for which benefits were denied." *Bergmann v. Apfel*, 207 F.3d 1065, 1069-70 (8th Cir. 2000); (evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition); *see also Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990) (evidence obtained after the ALJ's decision must relate to the condition on or before the date of the decision, or it is not material); *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1280 (9th Cir. 1987).

A.   Plaintiff does not meet her burden for remand based upon new evidence

In order for the Court to remand the case based upon the new evidence in the record, Plaintiff must show that the new evidence is material *and* that there was good cause for the failure to incorporate the evidence into the record in the initial proceeding. *Cotton v. Bowen*, 799 F.2d 1403, 1409 (9th Cir. 1986). There must be a "reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination had it been before him." *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir. 1983) (quoting *Dorsey v. Heckler*, 702 F.2d 597, 604-05 (5th Cir. 1983). Here, however, Plaintiff does not show good cause for the failure to incorporate the evidence into the record in the initial proceeding and stated only: "For whatever reason, these records were not available to the ALJ." (Doc. 20 at 27, n. 5). Therefore, the Court may not remand the matter based solely upon the inclusion of the new evidence in the record.

B.   Summary of the supplemental medical evidence

On November 21, 2005, Plaintiff was examined at the Neurosurgery Spine Clinic at Stanford University regarding back pain problems. AR at 429. Dr. Jangsoo Park conducted a physical examination of Plaintiff and noted her back pain "from the level of the SI joint up to the upper

lumbar spine . . . [was] approximately 90% of her pain syndrome." *Id.*  Plaintiff reported pain in her

chest and neck, extreme fatigue, and difficulty sleeping. *Id.* at 430.  Her pain was "worse with

sitting, standing, walking or physical activity and better when lying in a supine position." *Id.* at 429.

However, Plaintiff reported she exercised more than three times per week. *Id.* at 430.  Dr. David

Nathan concluded Plaintiff had "5/5 strength in bilateral lower extremities" and "normal sensation in

the lower extremities." *Id.*  He reviewed an MRI and concluded it "showed some degenerative

changes with desiccation at the L3-4, L4-5, and L5-SI disks," as well as "some facet arthropathy."

*Id.*  Dr. Nathan suggested an "L4-5 facet block/medial branch block" to treat pain and confirm a

diagnosis. *Id.* at 431.

Plaintiff received further examination at the Stanford Pain Management Center in February

and March 2006.  AR at 445-55.  She reported that her daily activities include light housework, and

on good days she walked about three miles, though she had not done much walking since September

2005. *Id.* at 446.  Plaintiff's lupus affected her skin, but not her kidney, heart, or lungs. *Id.*  On

physical examination, Dr. Afshin Zeighami observed:

> She is alert and oriented times three.  Very pleasant and cooperative in no acute distress.
> Has very mild pain behavior with grimacing.  She has skin lesions on her body from
> lupus. . . . Gait is normal.  She has normal toe and normal heel walking.  Forward flexion
> and extension within normal limits with some discomfort with extension.

*Id.* at 447.  Further, Plaintiff had some tenderness in her mid-thoracic paraspinal muscles, the left

greater trochanteric area, and her right lumbar region. *Id.*  Dr. Zeighami noted Plaintiff's range of

motion was within normal limits for her neck, upper extremities, and lower extremities. *Id.* at 447-

48.  In addition, Plaintiff's muscle strength was 5/5, "except for a right extensor hallucis longus

[was] 4+/5." *Id.* at 448.  On February 16, 2006, Plaintiff received a successful medial branch block,

which alleviated her pain for a few days.  AR at 452.  Dr. Zeighami recommended another medial

branch block, followed by "a radio frequency ablation of the medial branch nerve," which would

give Plaintiff relief "for about six months to a year." *Id.* at 453.

Dr. Iyer treated Plaintiff for knee pain on March 15, 2006, and noted examination "reveal[ed]

locking as well as the knee giving out" while an x-ray showed "some narrowing of the joint space."

AR at 450.  Dr. Iyer ordered an MRI, which was conducted by Dr. Gordon Zink-Brody on March 18,

1   2006. *Id.* at 455, 455.  Dr. Zink-Brody found unremarkable results, and no significant marrow

2   abnormalities. *Id.* at 455.  Therefore, he concluded there was not a meniscal tear or an internal

3   derangement. *Id.*

4          When Dr. Iyer completed a medical report of Plaintiff's physical impairments on January 23,

5   2007, a page was omitted in the evidence presented to the ALJ.  AR at 466; *see also* AR at 316-19.

6   On that page, Dr Iyer opined Plaintiff could use her hands for simple grasping and fine manipulation

7   occasionally and could use her feet frequently.  *Id.* at 466.  In addition, Dr. Iyer noted Plaintiff could

8   balance occasionally, but could never climb, stoop, crouch, kneel, or crawl.  *Id.*  Plaintiff could

9   occasionally reach, handle or feel, but never be able to push or pull due to her carpal tunnel

10  syndrome. *Id.*

11         According to the record, Plaintiff began treatment at the Central Valley Pain Management

12  and Wellness Clinic on April 26, 2007, after the unfavorable decision was issued by the ALJ.  *See*

13  AR at 320-58.  The information in these records does not relate to Plaintiff's condition during the

14  period on or before the ALJ's decision.  Moreover, Plaintiff does not establish that these documents

15  are material to the relevant time period.  *See Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001)

16  (claimant bears burden of showing that post-decision diagnosis is material to relevant time period);

17  20 C.F.R. §§ 416.330 (an application governs only the time period on or before the date on which the

18  ALJ issues a decision).  Therefore, records from Central Valley Pain Management and Wellness

19  Clinic will not be considered by the Court in its determination of whether the ALJ's decision was

20  supported by substantial evidence.

21                                **DISCUSSION AND ANALYSIS**

22  A.   The ALJ did not err at step two of her inquiry.

23         In this case, the ALJ "consider[ed] the claimant's complaints of lupus, shortness of breath,

24  fatigue, depression, cardiopulmonary disease, carpal tunnel syndrome/cubital tunnel/thoracic outlet

25  syndrome, and leg pain, to be 'non-severe.'"  AR at 17.  The ALJ noted she "was unable to

26  document sufficient objective medical signs and laboratory findings of a longitudinal nature" in

27  examining Plaintiff's complaints of lupus and depression.  *Id*.  Plaintiff asserts the ALJ erred in

28

1    failing to find her lupus and depression were "severe" impairments at step two of the inquiry.  (Doc.

2    20 at 21-22).

3         The inquiry at step two is a *de minimus* screening for severe impairments "to dispose of

4    groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) citing *Bowen v. Yuckert*,

5    482 U.S. 137, 153-54 (1987).  The purpose is to identify claimants whose medical impairment makes

6    it unlikely they would be disabled even if age, education, and experience are considered.  *Bowen*,

7    482 U.S. at 153 (1987).  At step two, a claimant must make a "threshold showing" that (1) she has a

8    medically determinable impairment or combination of impairments and (2) the impairment or

9    combination of impairments is severe.  *Id.* at 146-47; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

10   Thus, the burden of proof is on the claimant to establish a medically determinable severe

11   impairment.  *Id.*; *see also Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009)

12   ("The burden of proof is on the claimant at steps one through four…").

13        *Lupus*

14        The ALJ noted "although the treatment notes refer occasionally to a past diagnosis of lupus

15   or more often a "history of lupus," the undersigned finds no actual laboratory confirmation in the

16   record, and also notes that the diagnosis disappears entirely in the 2005 record and thereafter."  AR

17   at 17.  In addition, the ALJ observed Plaintiff's "X-rays and MRI's were **normal** and

18   **unremarkable**, and an EMG/nerve conduction study "produced completely **normal** results."  *Id.*

19   (emphasis in original).   In addition, the ALJ noted an MRI was negative with no abnormalities, and

20   a second EMG/nerve conduction study in 2003 showed "all motor nerves were '**within normal**

21   **limits**.'"  *Id.* (emphasis in original).   Likewise, in an EMG/stress test in 2005, "the claimant

22   demonstrated a 'fair to moderate' exercise tolerance."  *Id.* at 19.

23        Plaintiff asserts, "contrary to the ALJ's assertion, the record contained laboratory

24   confirmation of lupus," because a dermatopathology report noted "changes consistent with tumid

25   lupus erythematosus" and Dr. Pilkington diagnosed Plaintiff with tumid lupus.  (Doc. 20 at 26, citing

26   AR at 152).  In addition, Plaintiff asserts "the record contains numerous references to [her] diagnosis

27   of lupus after 2005."  *Id.*  Notably, however, the citations provided in support of this assertion

28   reference the supplemental medical evidence that *were not* before the ALJ.  *Id.* at 26-27.

On the other hand, Defendant asserts: "Results of a biopsy . . . suggest lupus but those findings were never analyzed or confirmed by Dr. Pilkington nor were the results of blood testing..., which were negative." (Doc. 22 at 10, citing AR at 152, 252).  In addition, Defendant observes:

> While Dr. Iyer stated in his December 2004 treatment notes that he was awaiting the results of the biopsy and blood work, he never discussed them again; he never referred Plaintiff to a specialist; he never ordered any lupus-related testing thereafter to monitor the status of the disease; he never discussed adjusting Plaintiff's prescription for Plaquenil; he never switched her medication in an attempt to improve symptoms; he never commented on how any of Plaintiff's complaints were related to lupus. . . . There is a total absence of evaluation, analysis, diagnosis, or testing related to Plaintiff's lupus impairment following the December 2004 biopsy and negative blood work.

*Id.* at 10-11.  The ALJ noted the absence of medical support for Plaintiff's assertion that lupus was a severe impairment as well.  *See* AR at 17.

Importantly, though Plaintiff asserts there is evidence that she was diagnosed with lupus, she does not establish that lupus is a severe impairment simply by virtue of the diagnosis.  Previously, this Court explained: "A mere recitation of a medical diagnosis does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities.  Put another way, a medical diagnosis does not an impairment make."  *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011); *Huynh v. Astrue*, 2009 U.S. Dist. LEXIS 91015, at *6 (E.D. Cal. Sept. 30, 2009); see also *Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability").  For an impairment to be "severe," it must significantly limit the claimant's physical or mental ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1520(c).  None of the records provided by Plaintiff support an assertion that her lupus is a severe impairment—even the residual functional capacity provided by her treating physician does not assert lupus was a cause of physical or emotional impairments.  *See* AR at 316-19, 466.  Therefore, it does not appear the ALJ erred in evaluating Plaintiff's lupus at step two of her inquiry.

*Depression*

According to the ALJ, "The record includes evidence of only very minimal mental health treatment, with the most recent consultative report finding her mental and emotional functioning essentially within normal limits, and consistent with a '70' GAF score."  AR at 17.  The ALJ noted

that Plaintiff reported to Dr. Morgan that "her emotional functioning was 'significantly improved' with Zoloft, and that she had only 'periods of depression.'" *Id.* at 18, citing AR at 159.  In addition, the ALJ observed, "Based on testing, Dr. Morgan found the claimant to have a 'mildly' depressed mood with 'mild' restriction of affect, but no thought disorder or psychotic symptoms, supporting the diagnosis of (only), 'depressive disorder, not otherwise specified, mild to moderate.'" *Id.*, citing AR at 157-63.

In addition, the ALJ discussed Plaintiff's consultative examination with Dr. Swanson, to whom Plaintiff reported "that she was fully independent with her daily activities which included household chores such as doing the laundry, shopping and driving a car." AR at 19.  Further, the ALJ noted Dr. Swanson's observation that Plaintiff "displayed no vegetative sings (sic) of depression, and that her concentration and memory functioning appeared to be within normal limits." *Id.*  The only diagnosis made by Dr. Swanson was that Plaintiff suffered from amphetamine abuse, with sobriety for 4 or 5 months.  *Id.*

Plaintiff asserts she was treated by Dr. Iyer for depression, "who variously prescribed Zoloft, Wellbutrin, Abilify, Cymbalta, and Xanaz in attempt to best treat [her] depression and anxiety." (Doc. 20 at 24, citing AR at 158-89, 236, 266, 278, 280, 325, 332, 457).  Also, Plaintiff notes Dr. Morgan assessed her with a mild to moderate depressive disorder, and Dr. Schnitzler opined she had a mild affective disorder, though it was non severe.  *Id.*

On the other hand, as Defendant contends, substantial evidence in the record supports the ALJ's conclusion that Plaintiff's depression was not a severe impairment.  (Doc. 22 at 11).  Notably, several physicians opined Plaintiff's depression was "mild" and not a severe impairment.  As noted by the ALJ, Dr. Morgan found Plaintiff had a mild to moderate depressive disorder.  AR at 17, citing AR at 161.  Following a consultative examination, Dr. Swanson concluded Plaintiff's "[m]ental and emotional functioning falls within normal limits."  *Id.* at 208.  Likewise, Dr. Schnitzler reviewed Plaintiff's medical records and opined her mental impairments were not severe.  *Id.* at 210. Therefore, the ALJ supported her conclusion that Plaintiff's depression was not a severe impairment.

Even if the Court were to find the ALJ erred in finding Plaintiff's mental impairment—or lupus— was "not severe" at step two, any error in designating specific impairments as severe at step

19

two is harmless.  *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (holding that any error in omitting an impairment from the severe impairments identified at step two was harmless where the step was resolved in the claimant's favor).  Here, step two was resolved in Plaintiff's favor because the ALJ found other severe impairments including degenerative disc disease at two levels of her lumbar/thoraci spine, obesity, and long-time amphetamine addiction.  AR at 17.  Moreover, the ALJ considered Plaintiff's subjective complaints of a mental impairment when making an alternative step-five finding.  *See* AR at 24.  Thus, there was no prejudice to Plaintiff at step two.

**B.   The ALJ's decision to afford less weight to the opinion of Plaintiff's treating physician was supported by substantial evidence.**

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Similarly, an examining physician's opinion is given more weight than the opinion of a non-examining physician.  20 C.F.R. § 404.1527(d)(2).

An ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence."  *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").  The opinion of a treating physician may be rejected whether it is contradicted by another.  *Magallanes*, 881 F.2d at 751.

1   Here, the ALJ gave "less weight" to the opinion of Dr. Iyer, because the ALJ concluded the

2   opinion "disagree[d] with all other examining, evaluating, and treating physicians." AR at 21.  The

3   ALJ found Dr. Iyer's opinions were inconsistent with the assessment that Plaintiff had a mild back

4   diseases, and were "not supported by objective medical signs and laboratory findings." *Id.*  Under

5   the Regulations, "signs" and "laboratory findings" are in turn defined:

> Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's] subjective statements (symptoms).  Signs must be shown by medically acceptable clinical diagnostic techniques…
>
> Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques.  Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays) and psychological tests).

11  20 C.F.R. § 303.1528(b)-(c).  Notably, the ALJ cited numerous examples in the record of objective

12  medical signs and laboratory findings in the record.  For example, the ALJ noted:  x-rays and MRIs

13  of Plaintiff's back and knee were "**normal** and **unremarkable**;" an EMG/nerve conduction study in

14  2003 by Dr. Dhaliwal "produced completely **normal** results;" Dr. King "observed an

15  '**unremarkable**' general review of systems, neck, upper extremity, left knee, and lower back;" a

16  "brachial plexus MRI was **negative** and confirmed **no abnormalities**;" an EMG/stress test in 2005

17  "was again **negative** for arrhythmia or ischemia;" and pulmonary function tests results were

18  "considered to be essentially **within normal limits.**" *See* AR at 17-19, citing AR at 132-39, 167-68,

19  288, 290 (emphasis in original).  In addition, the ALJ noted Dr. Iyer's opinion was not consistent

20  with a finding that Plaintiff suffered no more than a "mild" back disease. *Id.* at 21.  Therefore, the

21  ALJ gave specific and legitimate reasons for giving less weight to the opinion of the treating

22  physician. *See, e.g., Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (an opinion may be

23  rejected where there is incongruity between a treating doctor's assessment and his own medical

24  records, and the ALJ gave specific and legitimate reasons for rejecting the treating physician's

25  opinion by explaining why it "did not mesh with her objective data or history").

26  Moreover, the decision to give less weight to the opinion of Dr. Iyer was supported by

27  substantial evidence in the record.  The Commissioner explained medical and nonmedical evidence

28  may constitute substantial evidence, and clarified the term: [Substantial evidence] "is intended to

indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong.  It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion."  1996 SSR LEXIS 9 at *8.[4]  Here, the ALJ found the opinion of Dr. Nguyen was "supported by objective medical signs and laboratory findings of a longitudinal nature," and the opinion is substantial evidence in support of the ALJ's decision.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record"), citing *Magallanes*, 881 F.2d at 752.

When an ALJ gives less weight to a treating physician's opinion, the ALJ must "set out a detailed thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Cotton*, 799 F.2d at 1408.  Here, the ALJ met that burden.  Though the evidence may be "susceptible to more than one rational interpretation," the ALJ's decision is supported by signs and clinical findings and substantial evidence in the record.[5]  Therefore, this Court must uphold the ALJ's decision to give less weight to the opinion of Dr. Iyer.  *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); SSR 96-2p, 1996 SSR LEXIS 9, at *9 (the opinion of a treating physician is not entitled to controlling weight when the "opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record").

C.   The ALJ's adverse credibility determination was proper.

In determining credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other

---

[4] Social Security Rulings are issued by the Commissioner to clarify regulations and policies.  Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

[5] Notably, the ALJ's decision is supported also by the supplemental medical evidence.  For example, upon testing, Dr. Zeighami observed Plaintiff had "very mild pain behavior with grimacing" and her gait was normal with "normal toe and normal heal walking."  AR at 447.  Further, Dr. Zeighami noted Plaintiff's range of motion was in normal limits for all extremities, and her strength was 5/5, with the exception of her right extensor hallucus longus.  *Id.* at 447-48.

symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007), quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991). Here, the ALJ found Plaintiff's "allegations regarding her limitations are **not** totally credible." AR at 23 (emphasis in original).

An adverse finding of credibility must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ may not discredit a claimant's testimony as to the severity of symptoms only because it is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48. In addition, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

Credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Here, the ALJ considered Plaintiff's work history, inconsistent statements, the medical evidence, and a statement made by Plaintiff's sister-in-law. In general, these are proper factors in a credibility determination. *See Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) ("the ALJ may consider at least the following factors when weighing the claimant's credibility: claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complaints") (citation omitted).

### Plaintiff's work history

As an initial matter, the ALJ noted, "The claimant has admitted that she has apparently based her alleged onset date for Social Security disability on the date she voluntarily 'took time off' to care for her husband who had heart problems." AR at 21, citing AR at 73. This was a valid consideration in the ALJ's adverse credibility determination. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (holding the ALJ properly considered, as part of the credibility assessment, the claimant's

1  admission that he left his job for reasons other than his alleged impairment); *Drouin v. Sullivan*, 966

2  F.2d 1255, 1259 (9th Cir. 1992) (as part of the credibility determination, the ALJ considered that the

3  claimant had not lost her jobs because of her alleged severe pain).

4      *Inconsistent statements*

5      An ALJ may consider "inconsistent statement concerning the symptoms" a claimant alleges

6  as part of a credibility determination.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  Here,

7  the ALJ noted several inconsistencies in Plaintiff's testimony and her reported limitations.  For

8  example, regarding Plaintiff's ability to sit, the ALJ noted:

> The claimant estimated that she could sit for no longer than 15-20 minutes (while obviously sitting for greater than 15-20 minutes during her hearing). . . Also concerning her reported maximum sitting tolerance, the undersigned observes that on November 3, 2005, the claimant had estimated that she could drive a motor vehicle for "60-70 miles one way" . . . suggesting a rate of speed consistent with that of a race car driver if she would be able to drive such a distance in only 15-20 minutes.

13  AR at 21, citing AR at 119 (Plaintiff stated, "I can drive 60 to 70 miles at one time.").  Notably, it

14  was permissible for the ALJ to infer Plaintiff's statement meant she could drive 60-70 miles without

15  a break, and to include her own observations.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.

16  1999 (an ALJ may draw logical inferences); *Drouin,* 966 F.2d at 1258-59 (the ALJ's personal

17  observations of the claimant during the hearing, was one of several factors in determining the

18  claimant's allegations of severe pain were not credible).

19      However, Plaintiff argues these statements were not valid considerations for credibility, and

20  asserts, "Ms. Lundell actually stated she could sit for no more than 15-20 minutes before she would

21  have to change positions.  In addition, contrary to the ALJ's assertion, the hearing before the ALJ

22  lasted only 19 minutes (started at 2:25 and ended at 2:45)."  (Doc. 20 at 35).  However, in this

23  manner Plaintiff seeks to change her testimony.  At the hearing, Plaintiff testified she would be able

24  to sit, without needing to get up, for "15 or 20 minutes, if that, maybe ten."  AR at 503.  Even

25  assuming Plaintiff was seated for only the time the hearing was recorded, the ALJ's observation

26  contradicts Plaintiff's testimony that she could sit "maybe ten," and seemingly up to twenty, minutes

27  without needing to stand.  Consequently, it was not error for the ALJ to include her personal

28  observations along with her determination that Plaintiff made inconsistent statements.

1      *Medical evidence*

2           Generally, "conflicts between a [claimant's] testimony of subjective complaints and the

3      objective medical evidence in the record" can constitute "specific and substantial reasons that

4      undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir.

5      1999); *see also* SSR 96-7p, 1996 SSR LEXIS 4, at *2-3 (the ALJ "must consider the entire case

6      record, including the objective medical evidence" in determining credibility, but statements "may not

7      be disregarded solely because they are not substantiated by objective medical evidence").

8           Here, the ALJ did not base her decision solely on the fact that the medical record did not

9      support the degree of symptoms alleged by Plaintiff.  Nevertheless, to rely upon the medical

10     evidence, "the ALJ must specifically identify the testimony she or he finds not to be credible and

11     must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195,

12     1208 (9th Cir. 2001).

13          Here, for example, the ALJ noted Plaintiff's testimony when she stated "she was fearful and

14     had memory problems."  AR at 22.  This was contradicted by "[c]onsultative psychological

15     evaluations [that] confirmed that the claimant's memory and concentration functioning were within

16     normal limits."  *Id.*  Specifically, the ALJ noted Dr. Swanson observed Plaintiff's "concentration and

17     memory functioning appeared to be within normal limits" and that Dr. Schnitzler "concluded on July

18     20, 2005 that the claimant's mental impairments would be no more than mild, or "non-severe." *Id.*

19     at 19, 21.  Because the ALJ provided specific examples of which testimony was not credible, and

20     what evidence suggested Plaintiff was not credible, consideration of the medical evidence was

21     relevant to the adverse credibility determination.  *See Lester*, 81 F.3d at 834; *Johnson v. Shalala*, 60

22     F.3d 1428, 1434 (9th Cir. 1995) (inconsistencies with medical evidence supports a rejection of a

23     claimant's credibility).

24          Given the considerations made by the ALJ, the ALJ properly made "a credibility

25     determination with findings sufficiently specific to permit the court to conclude the ALJ did not

26     arbitrarily discredit [the] claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir.

27     2002).  Consequently, the adverse credibility determination was proper.

28     ///

D.  The ALJ addressed the third-party statement in an appropriate manner.

The ALJ must consider statements of "non-medical sources" including spouses, parents, and other relatives in determining the severity of a claimant's symptoms.  20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work.").  As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted).  To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill*, 12 F.3d at 919.

Plaintiff asserts the ALJ mischaracterized the third-party statement made by Plaintiff's sister-in-law, Pamela Real.  (Doc. 20 at 36-37).  Ms. Real observed Plaintiff could no longer care for her animals or do activities "in the previous capacity," and that Plaintiff's "involvement with her niece and nephew has lessened as she is unable to join them now at most of their activities."  AR at 94.  In addition, Ms. Real observed Plaintiff could prepare her own meals, perform light cleaning, do laundry, shop for groceries, and go outside regularly to take the dog out and get the mail.  *Id.* at 95-96.  Though she did not believe that it was "a good idea for [Plaintiff] to be alone," Ms. Real reported Plaintiff could drive and go out by herself.  *Id.* at 96.

The ALJ rejected portions of Ms. Real's statement while evidently relying on other portions to describe Plaintiff's daily activities.  The ALJ noted, "the claimant's sister in law had observed the claimant performing light housework such as the laundry, taking care of a pet, shopping for groceries, and driving a car. . ."  AR at 22.  This is similar to the statement Plaintiff made to Dr. Swanson "that she was fully independent with her daily activities which included household chores such as doing the laundry, shopping and driving a car." *Id.* at 19, citing AR at 205-08 ("the claimant reported that she is independently able to complete all activities of daily living," including preparation of meals, shopping, and talking walks, driving, and making use of public transportation).  Also, the ALJ noted Ms. Real "indicated that she saw the claimant a few times each week, and had apparently been told by the claimant that she had restless sleep and could not work because of sitting,

26

standing, and walking problems." *Id.* at 22.  According to Ms. Real, Plaintiff "remained able to pay

bills, count change, handle bank accounts and a check book, and denied that she required any one to

accompany her when she went out in public alone." *Id.*  The ALJ interpreted the statement provided,

along with other evidence in the record, to conclude that Plaintiff's abilities and activities are

"consistent with 'light' work." *Id.*  Such a conclusion is with the providence of the ALJ.  *See Burch*,

400 F.3d at 680 (the claimant's activities "suggest she is quite functional.  She is able to care for her

own personal needs, cook, clean and shop.  She interacts with her nephew and boyfriend. She is able

to manage her own finances…").

E.   The vocational expert testified regarding the RFC determined by the ALJ and supported by
substantial evidence.

     Plaintiff asserts the ALJ erred in assessing her RFC and in applying the vocational expert's

testimony to conclude Plaintiff could perform past relevant work as an office manager.  (Doc. 20 at

40-41).  When seeking the testimony of a vocational expert, the ALJ may pose "hypothetical

questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational

expert's consideration" when eliciting testimony.  *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir.

1999), quoting *Gamer v. Sec'y of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987).

The description of impairments "must be accurate, detailed, and supported by the medical record."

*Id.*  Only limitations supported by substantial evidence must be included in the question.  *Robbins v.*

*Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock*, 240 F.3d at 1163-65.  "If the

assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert

that the claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753

F.2d 1450, 1456 (9th Cir. 1984).

     Plaintiff asserts the ALJ erred in assessing her RFC and in applying the vocational expert's

testimony to conclude Plaintiff could perform past relevant work as an office manager.  (Doc. 20 at

40-41).  As discussed above, the residual functional capacity set forth by the ALJ is supported by

substantial evidence including the opinion of Dr. Nguyen and the objective medical signs and

laboratory findings by several physicians.  The ALJ incorporated the RFC the hypothetical question

in which she asked the exert to consider one who "could occasionally lift 20 pounds, frequently ten;

stand at least two hours in an eight-hour day; or sit six hours in an eight-hour day." AR at 509.  In addition, the person could "only occasionally climb rams or stairs; occasionally stoop, kneel, crouch, and craw; but can never climb . . . ropes or scaffolds." *Id.*  The VE opined such an individual would be able to perform Plaintiff's past relevant work as an office manager. *Id.*

Therefore, because the "weight of the medical evidence supports the hypothetical questions posed by the ALJ," the ALJ's findings will be upheld by the court. *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

<u>**CONCLUSION**</u>

For all these reasons, the ALJ's determination that Plaintiff was not disabled during the relevant time period must be upheld by the Court.  The ALJ did not err in her assessment at step two of the sequential evaluation, or in evaluating the medical and testimonial evidence.  Further, the ALJ asked a proper hypothetical question to the vocational expert based upon the residual functional capacity supported by substantial evidence in the record.

Notably, the additional medical records upon which Plaintiff relied to show a mental impairment were dated after the relevant time period, and therefore not considered by the Court.  *See* 20 C.F.R. §§ 416.330 (an application governs only the time period on or before the date on which the ALJ issues a decision).  To the extent that Plaintiff's health condition changed or worsened in the period after the ALJ's decision, nothing prevents her from filing a new application based upon the new evidence.  *See Sanchez v. Sec'y of Health & Human Servs.*, 812 F.2d 509, 512 (9th Cir. 1987) (new evidence indicating mental deterioration after date of ALJ's decision may be material to new application); 20 C.F.R. § 416.330(b) ("If you first meet all the requirements for eligibility after the period for which your application was in effect, you must file a new application for benefits.").

Accordingly, **IT IS HEREBY ORDERED**:

1.     Plaintiff's motion for summary judgment is **DENIED**;

2.     Defendant's cross-motion for summary judgment is **GRANTED**; and

2.     The Clerk of Court IS DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Pamela Lundell.

IT IS SO ORDERED.

1    Dated:   **August 30, 2011**                          **/s/ Jennifer L. Thurston**
                                              UNITED STATES MAGISTRATE JUDGE
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28